Please step up and identify yourselves. Good morning, Your Honor. Stephanie Buente from the Office of the State Appellate Defender on behalf of Mr. Edward Brown. Good morning. Assistant State's Attorney Whitney Bond on behalf of the people of the State of Illinois. You know our General 15, but we're usually reasonable, especially if we ask a lot of questions. But don't just keep meandering back. May it please the Court, Stephanie Buente from the Office of the State Appellate Defender on behalf of Edward Brown. Officer Babbage physically intruded into the vestibule of Edward Brown's traditional Chicago-style two-flat. The State concedes that the officer didn't have probable cause to enter. Thus, the question presented is whether the vestibule is privileged or it's an area in which Brown had a reasonable expectation of privacy. Under either the property rights approach or the privacy rights approach, we maintain that the officer's entry into the vestibule was unreasonable and does not fall within the good faith exception of the exclusionary rule. In Florida v. Jardines, the U.S. Supreme Court found that the front porch was the classic textbook example of curtilage. The enclosed vestibule is also just like a front porch in that it's an area adjacent to the home into which activities of the home quite extend. You can consider it as a mudroom for city residents where they store their shovels, strollers, bikes, and winter boots. It's also an area where kids may play or where residents might chat. Also, the area, like a front porch, acts as a passage to the house. Here, the front door opened to the small vestibule area. The small vestibule area led into a small staircase, which led to a landing, which led into Mr. Brown's apartment. The Illinois Supreme Court has applied Jardines in the context of a 12-unit apartment building, most recently in People v. Burns. There, the Illinois Supreme Court rejected the same exact arguments the State is making here. That is that Jardines only applies to a single-family residence, and it's not applicable to apartments because there's no legitimate expectation of privacy in a common area of such multi-unit building. In that case, did the defendant move to suppress on that ground in the trial court? He moved to suppress on the basis of whether the use of a drug detection dog sniffing the front door of his apartment building. But under Jardines, House Scalia framed the analysis. First, he has to determine whether the area it falls within, it's a constitutionally protected area. My point is the issues were framed in the trial court, right? Both sides were on notice of what the argument was, and we don't have that here, right? Well, although the trial counsel advanced a different theory, the State has conceded that the record is sufficient for this court to address whether, as a matter of law, whether the entry into the vegetable was unreasonable or not. And so we have sufficient testimony for you to make that determination. And additionally, under Cregan, it's not – as long as the Fourth Amendment violation is raised below, it doesn't violate any additional claim that can be raised in a post-conviction petition such as this. If we accept your proposition that this was a private residence, the officer here was trying to make a Terry stop, and the defendant ran away from him while he was doing that. Isn't he allowed to pursue the defendant who tries to evade a Terry stop? Well, we're going to take first that there was no reasonable suspicion to conduct a Terry stop. So initially, there's – the initial encounter, there was no probable cause – I mean, no reasonable suspicion, excuse me, Your Honor. The defendant – Mr. Brown was just standing and loitering on the sidewalk in the dark in an area known for crime and narcotics. There's no testimony that he was armed or that he was involved in any drugs transactions or that he was holding any, like, opaque bags to imply that he was going to sell any drugs. Therefore, because there was no reasonable suspicion, and the fact that he fled doesn't give rise to reasonable suspicion because the officers there were here, unlike in cases such as Wardlock. The officers were plainclothes, unmarked car. They didn't have time to announce. It was dark, and there was no testimony that there was eye contact between Mr. Brown and the officers for him to know that he was fleeing from officers. There's – you know, because it's such a crime-infested neighborhood, he might have been – you know, he might have feared for his life that two people were approaching him. Even if there was reasonable suspicion, because the area – the vestibule, we're arguing, is either a curvilege or an area in which Brown had a reasonable expectation of privacy, reasonable suspicion doesn't allow you to cross the threshold – did not allow the officer to cross the threshold of the front door and into the vestibule. They needed probable cause. And the officer was not in a lawful place to develop that probable cause when he saw Brown drop the narcotics into the vestibule area. Recently, another division of this court, in People v. Martin, extended Jardines into – they applied Jardines into – it was a two-flat owned by one family. And there, the court said that due to the unique characteristics of this traditional Chicago two-flat and the fact that the nature of the living room – This is all being assessed. Ha, ha, ha. You can go on. This is all being assessed. Go on. Take your time. You know, we've got idiots that work for the state police. They're total idiots. This is all being assessed. So because the two-flat was owned by the mother of the defendant in Martin, the court in Martin said that a building occupied by the same family, it made it more likely that the vestibule area was a common area for purposes of the Fourth Amendment protection. Here, we're arguing that it also applies because we have testimony from Brown's mother that her grandmother – I mean, her mother, Brown's grandmother, owned the entire building. It's a two-flat with two apartments on each floor, and that because of the arrangement of the building, that they would spend most of the time – other residents would spend most of the time in the apartment in which she lived because her mother lived with her. Counsel, can I jump you to the good faith argument? Sure. How is the police officer at that moment supposed to know who owns that apartment building? Especially when, realistically, all you can do is think in reverse order. You're going from – after the fact, the police officer going in, now you're saying it's a home a year or two later, and you're trying to justify your position versus an officer that has no idea what a building is unless it was a single-family home. Well, because these type of two-flat buildings are so common throughout Chicago – I mean, you just have to drive down to Midway Airport and you pass by neighborhoods with rows and rows of these two flats, which make up 30 percent of the housing stock of Chicago. The fact that this is not a large, multi-unit residence – he should have known that it was a house. At least there's one door leading into the building. It's not – based on the testimony, there's nothing to indicate that this was a bigger apartment complex. Well, assuming we accept that it is – or we accept your argument, which the state won't, how do you get over – if we don't accept it, what other argument do you have to justify your position versus the police officer in, say, high pursuit or whatever? Okay, so because there was no – if I could go back just slightly to the good-faith exception to make sure I answered your question. Those cases that the state relies on – I believe it's Lyles and Carradine – are completely factually distinguishable from this case. Lyles involved whether there's a reasonable expectation of privacy in an air-dryer vet that's attached to the exterior wall of the apartment building. So it doesn't involve any intrusion into an enclosed space, such as here. Carradine involved whether there's a reasonable expectation of privacy in an unenclosed porch in the back of the house. Again, it's an open area, and there's no enclosure to it. Therefore, they're factually distinguishable. And also, there was a United States Supreme Court case at that time saying that an area extending – there's cats, and then there was also done in Carradine that recognized that people have a – the curtilage of the home is a reasonable – they have a reasonable expectation of privacy, or it's a constitutionally protected area, which police officers should have known as soon as they crossed the threshold that it was a constitutionally protected area. And it's not even a peaceful entry. The only reason the officer gained entry into the threshold is because he used his shoulder to keep the door from closing. What he could have done, even under Jardines – and if he had done this, we wouldn't be here – is he could have stopped at the door, at the threshold of the door, because there is testimony that the door was made out of wood and it had glass cutouts. He could have looked through there and seen the drop, and then he would have had probable cause to enter into this protected space, but he didn't. As to exigent circumstances, again, they don't apply here because there's no testimony that Brown was committing any crime just by standing on the street. He was just loitering. And even the trial court said, loitering is not a crime. This is not your typical case where you have testimony from the officer saying there's sort of movements or some kind of – or even, like, languages of hearing the defendant yelling out, blows, blows. So that's why – because there was no reasonable suspicion from the initial entry. Exigent circumstances doesn't apply. Also, Your Honor, I mean, the two – the privacy rights and the property rights over – overlying, and that's something that Scalia – Justice Scalia, the late Justice Scalia, recognized in Jardine's, that even, you know, the reasonable expectation of privacy test adds to this test. And so because there's a physical intrusion here, even so slight, into the – this protected area or into an area where Mr. Brown had a reasonable expectation of privacy, it's unreasonable without a warrant or without probable cause and exigent circumstances that there weren't here. Is there any more questions you have that I can answer for you? No, I think – wait and see what they do, and then you'll have another opportunity. Okay. Because the vestibule is a cartilage or area in which Brown had a reasonable expectation of privacy, officers – the officer's intrusion was unreasonable and does not fall within the good faith exception. Thank you. Thank you. Again, what was your name? My first name is Whitney Bond, like James. Okay. You were – you're the third one. I just was looking, and I had the names, and I didn't see – I'm the third on the list. Yeah, because I saw Collins, but I didn't see Whitney. She was my illustrious BOS on this case. So again, Your Honors, my name is Assistant State's Attorney Whitney Bond, and I represent the people. In the record before you, Officer Babich was legally where he was allowed to be when he saw the defendant discard the drugs in a common area of a multi-unit apartment building. Well, you're starting at the end. I'd like you to start at the Terry stop and tell me how we get beyond it, because I don't see a valid Terry stop for any reason in my mind. Well, I think we have to – I mean, it's just – I don't see it. Okay. Fair enough. So what we have here are two officers on routine patrol who had just finished up a narcotics arrest. They are driving as they do, and they happen to see this defendant, who Officer Babich testified that he may have had contact with before. They are in an unmarked vehicle, which he did say that there was some indicia of police on it. Officer Babich testified that he got out of that car to approach the defendant for a field interview, but before he even could immediately announce his office, the defendant fled. Officer Babich testified that he had his star on his vest, he was wearing his nameplate designator, and he had police on the back. Upon that flight in a high-crime area, pursuant to ward law, the officer was able to pursue, and that's what he did here. He simply pursued. He followed. There's no Fourth Amendment violation in following this defendant into what is an open and unlocked vestibule of what he described was a residential building. And on that point, I think it's important to note that this is a residential building. Every single witness that testified at trial regarding this building describes it as such. And in preparation for this argument and indirect response to the defendant's reply brief's contention that it was defendants' family members who lived in all four units of this building, I came back to this court to review the records and make sure that, from what my notes understood, that that was not the case. And, in fact, defendants say it's the four pages of the record that defendants' family all lived in those units. On DDD-25, the defendant testified that it's his grandmother's building. On EEE-16, the defendant's girlfriend testified that it's a family building. On EEE-31, the defendant's mother testified that her mother owned the building. And on EEE-40, the defendant's mother testified that families occupy the other three units. At no time did anybody testify that these were the defendant's families. And that makes sense when you look at the record and defendant's testimony that he lived in his apartment with his mother, which is a two-bedroom, with seven other family members because all the other units in that building were rented by other families. Now, that, in and of itself, does not qualify this as a single-family home for purposes of analogizing this case to Martin, where, in Martin, that case was a duplex. So one apartment down and one apartment above. There was no one living in that second apartment, just the mother in the first floor, and she testified that she, indeed, treated it like a family home, which we don't have here. She put trespassing signs. She testified it was always locked, and she testified that there was fencing around, and that, specifically, that's how she viewed her home. And this court found that the officers should have recognized it as such. And we don't have that here. In fact, what we do have here is a record that this court can affirm the trial court's decision. What we have on appeal is a newly formed issue that really was born from the only testimony below that the trial court found credible, which was Officer Babbage's. The issues below were that officers unknown in number busted into the defendant's apartment and searched his place or his person and found drugs. And here we are today. So we agreed that this court could hear this matter based solely on this record, because it is the people's contention that the vestibule located at 4023 West 5th Avenue was not curtilage to the defendant's mother's apartment, nor did this defendant enjoy any sort of expectation of privacy that would trigger the Fourth Amendment protections. Are you saying you don't need Terry? I'm saying that for what Justice Smith asked for, we need Terry and Wardlow in this instance. But at this point, all Officer Babbage was doing was following the defendant. And it's our position that there is no way that he would have known that this is anything but a residential building. It's two stories. It's four apartments. It's an open and unlocked door that he proceeded into. Now, whether or not the door hit him as the door is shutting or people do not contend that he barged in, the fact remains that it was an open area in a common space, or this defendant doesn't have reasonable expectation of privacy. How far was the defendant from the front door when the police officer got out of the car? He said approximately 8 to 10 feet. Officer Babbage said approximately 8 to 10 feet. He saw the defendant. The defendant immediately fled. Officer Babbage chased him. He got to the door and through the door, and the defendant was approximately 10 feet inside that vestibule when he saw him discard the drugs. With regard to the curtilage, it's the people's position that the best – And what was the reasonable articulable suspicion if we're talking about Terry? I think what we're talking about here is that he's in a high-crime area. He's aware. They're on routine patrol. He's aware of this defendant, and the defendant immediately gave flight. I believe if you have that high-crime area and that flight, that leads you to the reasonable – If he didn't feel it was – even if he felt it was a cop, he doesn't have to stop for the cop. Under Whitaker, he doesn't have to unless he's doing something. And he's – at this point, he's doing nothing. He's got no indication. There's no – he wasn't holding anything in his hand visibly. And that's all I agree with you. My point is that the officer – this was in a Fourth Amendment event, when the officer – he was simply following the defendant. He wasn't trying – it was – it didn't get to the Fourth Amendment until we're talking about once you drop those drugs. Then he had probable cause to seize them. Well, that's why I asked you if you need Terry. Are you arguing that Terry's irrelevant here? No, I'm arguing – All he did was – you can follow someone without needing Terry, right? I'm – I – You don't need Terry to – I feel about it that you could follow somebody without needing Terry. But in this case, he needs both. I mean, it's – it's the placement of being in a high-crime area and then the immediate flight. I think it's a totality of the circumstances. With regard – Do you think that there's evidence that he knew this was a cop? I do, yes. He testified, and he was found credible by the trial court below. He testified that he was wearing his police vest, and he was wearing – or his police vest with his star, his nameplate designator, and – That doesn't – doesn't give me enough to know this is a police officer. Well, he was also in an unmarked car with some – and he did not clarify what that was, but with some indicia of that it was a police vehicle. There was no instruction given to defend a bylaw officer? No. There wasn't time. With regard to the curtilage, so it's people's position that this officer was in a place that he was allowed to be. Because when we look at what constitutes curtilage of the defendant's mother's apartment, none of the four done factors favor him in this instance. The number one is proximity. This vestibule was approximately 30 feet from the defendant's front door, and also there was a small flight of stairs in between, which is vastly different than a lot of the – all the cases that the defendant relies upon when we're talking about the front porch of a home or perhaps the threshold of a doorway. There – the inclusion of the area or the vestibule within an enclosure surrounding the home, there's no testimony in the record that there's any fencing. The nature and the use of the vestibule, this wasn't solely defendant's vestibule to use or an unlimited purpose like a threshold of a door would be where the tenant in that unit would be the one that would go in and out. This is an area that everyone in that building uses. So however many families are using it, their invitees, male personnel, because there is testimony that there are mailboxes in that vestibule. So this is a common area. But now you've said all these people live in the building. Mm-hmm. You have not said that they are not in one way or another related to each other. There is absolutely no testimony that they are related to each other. The only testimony that's speaking to the familial sort of description of this building are the witnesses that talk about how the defendant's grandmother owns the building. The only time you hear about families in other units is from the defendant's mother, but she never specifically says that those families are related to her family. Now the family members who are related to the defendant, they all live together in the two-bedroom apartment that his mother owns. So presumably there's other people in the multi-units. The other three, we don't know who they are. But according to the testimony, there's families living there, so they would need to come and go through this vestibule as well, including their invitees, and as well as the mail carriers or any sort of service personnel. And finally, the fourth done factor, the steps taken by the defendant to protect the area were literally none. This vestibule is enclosed by an open and unlocked door that led to the outside. The defendant testified there was no need for a buzzer or no need for a key to get in. On the date of the incident, it was open and unlocked. This vestibule isn't an area that courts typically look that harbors intimate activity. I would say it's the opposite of that. It is one that is mass-trafficked, and to say that it is a curtilage to defendants' mother's apartment so many feet away to garner Fourth Amendment protections is quite the stretch. Now with regard to the defendant's expectations of privacy, the people also agree that there is no expectation of privacy in a common area and in apartments and buildings that are accessible by other tenants and their invitees. Without repeating myself too much, I know the court has read the record, again, this is a vestibule of a multi-unit apartment building. This isn't a two-flat like it was in Martin where it would be limited in its access. And on the day in question, the door was open and unlocked, and that would expose, in and of itself, that vestibule to the world. But there's some contention as to whether the door would or wouldn't lock because there is testimony that the officer hit the door. There's testimony. Well, and he also specifically said that he passed through an open and unlocked door. But he didn't contest any of the statements that the parties made. He didn't say that they were not true. He did not say that they were not true, but the child court was the trier of fact and understood and could look at the credibility of the defendant's witnesses. And the defendant himself said, it wasn't locked. I don't lock it. You don't need a key. You don't need a buzzer to get in. The defendant's girlfriend had no point on that issue, and it was only the defendant's mother who justified that while she was letting out the defendant the evening of Valentine's Day, she was going to lock the door.  Or that residents in that building all collectively came together as a four-unit building and said, we will always keep this door locked. But it doesn't matter because on the day in question, the officer testified it was open and locked, which was evidenced by the defendant's behavior as he was able to cleanly go through the door. Can you talk about Bonilla? I'm sorry? Can you talk about the Supreme Court decision in Bonilla? Yes. And Burns. These are multi-unit. They are multi-unit. And Bonilla, the door, there was no locked door, right? So Bonilla was, yes, it was unlocked door, and it was a multi-unit building. But again, we're having, it's kind of a cartilage distance sort of issue. I mean, what we're talking about in Bonilla is it is at the threshold of an apartment door in a building where, like, the Bonilla court said that it didn't matter if it was locked or unlocked. What they were concerned about was protecting, like, the sanctity of the home. And it's our position that that's very different than what we have here. This isn't an issue where there's a threshold, and you're worried about a drug-sniffing dog up underneath the door to see what's inside the home. What we have here is an officer pursuing a defendant through an open door and watches he discarded drugs. There was no difference between our case and those cases, Burns and Bonilla and Hardeen, is that they were more concerned with the immediacy of the search and the distance of the search and whether or not the officers conducted a proper search. And here we don't have that. We don't have that immediacy of conducting a search with a drug-sniffing dog at a threshold of an apartment door, regardless of whether or not the multi-unit apartment building was locked or unlocked. What we have here is an unlocked apartment building where the defendant was found dropping drugs in a common area of a two-flat with four apartments in it. Do we run the risk of creating different constitutional rights for people who have money enough to own a private home and porches, enclosed porches, versus people who maybe don't have those means and live in apartments? That's an interesting question. I thought it was, too. You know what? They told me in law school, don't ever say that to justices, and I totally disagree. What I think about that is I don't think your ruling in this case, should you choose to affirm it, I don't think it's going to chip away at any sort of Fourth Amendment protections. I think it's actually going to strengthen them, because say you're giving an opportunity for maybe a lower-income family that lives in a building typical to this, where the door is always open and unlocked, and you say, okay, that vestibule is curled to an apartment that's X amount of feet away. Where's the expectation of privacy that society is meant to recognize on behalf of all those other people who probably prefer that a defendant not use their common area to maintain their contraband, as it were? I mean, I don't think that locks and no locks are what's going to be dispositive of this issue, and I do think in Bonilla, I think they expanded and said, you know, it doesn't matter if it's locked or unlocked, it's a distinction without a difference. And in our point, it's this door was unlocked on that day. And like the loggers, that's all it takes, because when you're, you know, talking about this expectation of privacy, leaving something completely open and exposing it to the public is a juxtaposition to that. So I hope I answered your question. Okay. If there are no further questions, it is people's position that while this issue is very, very different than what was posited below, it's our position that you have enough to affirm on this new claim. If there's a point where you think that perhaps you need to reverse on this matter, then the people would have a strenuous objection to that, because we were not allowed these opportunities to address these specific claims below. This wasn't an issue of privilege below. It wasn't an issue of reasonable expectations of privacy or those that society is willing to recognize. Certainly if we had that opportunity and knew that the issues would be framed in that way, we could have responded in a way that doesn't leave you with questions on appeal. So it's the people's position that the vestibule was not privileged, that this defendant had no reasonable expectation of privacy in it, and that Officer Babich acted lawfully that day and was in a place he was lawfully allowed to be when he saw the defendant discard drugs, abandon it. Counsel, I'm sorry to interrupt. I know you're closing up here, but what would be our options at that point? If we thought that there was a claim here that had some merit, but maybe there's some undeveloped record, and it's not, I think you're right, it's not the state's fault. The state didn't know this was an argument at trial. There is a much more limited Fourth Amendment claim in a motion to suppress, and then they just tried the case. What would be our options there? What should we do if we reach that point? If you reach that conclusion, I would implore you not to reverse. I would ask that you send it back, and let's do a hearing on a properly fleshed-out motion where these are the issues that are before the court, and let our state's attorneys handle the witnesses and let the chips fall where they may. But it is strongly our position that everything that you have before you is enough to affirm the trial court's decision. If there are no other further questions. Go ahead. Thank you, Your Honor. As to the Terry, there was nothing. Not even, they cannot salvage the initial stop, say that there was Terry because there was prior contact with, between the officer and Mr. Brown. If that was the case, they could stop by anybody. And that's not what Terry was formulated to do. As to the residents, just to clear up, based on the record, you have sufficient testimony to know that it was a residential house. Janella, the mother, said she's lived there since 1990. All her kids live with her. And Brown also lives with her, even though occasionally he stays at his girlfriend's house. As to whether everybody else who lived in the other three apartments were related, this is exactly what she said. She testified that families occupy each apartment in the building, but mainly by, you know, my mom being in that one and I being in that one, when we, in the daytime, we mostly be at my apartment. We acknowledged in our opening brief that, although it's somewhat unclear, it seems to imply that Janella, that she testified that other family members occupied in the building. As to whether Mr. Brown does not have a reasonable expectation of privacy just because the door was unlocked, that argument goes against common sense. This is not a case where the door was left open all the time. The door was simply left unlocked because Brown stepped out of his house and stood on the sidewalk. Do we abandon our expectation of privacy when we go out to get our mail and leave the door unlocked or run to our car to get our groceries or anything like that? We don't do that. The only reason Officer Babbage could say the door was unlocked because he used his shoulder to prop the door from closing and, therefore, didn't give Brown the opportunity or the chance to be able to lock the door. And, again, we would ask, we maintain that the record is sufficient to reverse. What about Justice Ellis's question about that partially this is a new or different argument than that which was raised in the trial court, that being the home? Again, we said there's sufficient evidence. You'd have the same witnesses testify at the hearing. You'd have Brown's mother testify again. And she said all that is needed for a court to resolve the ultimate matter of law issue, which is whether there was a Fourth Amendment violation. She testified, again, that's her family home. Counsel, if the argument had been about the vestibule, then I would imagine we would have been hearing a lot of testimony about the vestibule and the distances. And this question about the family probably wouldn't have ended up being vague. Probably somebody would have put a finer point on it and said, who lives in each apartment? Are they all members of your family? Is this a family home or is this one or two of the apartments are lived in by the owner and the other two are less? I mean, in all fairness, the state didn't see this coming at all. They could have easily covered some of these things and so could trial counsel, but nobody was talking about this. If Your Honor states the record is ambiguous, then sure, if they think it was better to resolve this issue by remanding for a new motion to suppress, to have the record more developed, then that would be an appropriate remedy as well. We maintain the record sufficient as it is because you do have the people who would testify and what they would say. And we do have testimony about the distance. And Officer Babich, although he was found credible, none of his testimony rebuts Mrs. Brown's testimony as to the locker who lived in the residence. And again, we're not asking this Court for a broad-blade rule. It's just under Jardines, Burns, Bonilla. The Court said recognize each case as fact-specific. And there shouldn't be just a broad-blade rule outlawing any defendant to raise and argue whether the land dean or the vestibule of his home is not curtilage. If Your Honors have no further questions, it's based on the record that we have Officer Babich did not have entry into the vestibule, which is a protected area, a constitutionally protected area, or a place in which he had reasonable expectation of privacy, was unreasonable and does not fall within the good faith exception. Thank you. Thank you. You both argued very interestingly, so we'll think about it.